# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued October 7, 2019        Decided August 4, 2020

No. 18-5334

DEPARTMENT OF MEDICAL ASSISTANCE SERVICES OF THE
COMMONWEALTH OF VIRGINIA,
APPELLANT

v.

UNITED STATES DEPARTMENT OF HEALTH AND HUMAN
SERVICES AND ALEX MICHAEL AZAR, II, SECRETARY, U.S.
DEPARTMENT OF HEALTH AND HUMAN SERVICES,
APPELLEES

Appeal from the United States District Court
for the District of Columbia
(No. 1:16-cv-02008)

*Susannah Vance Gopalan* argued the cause for appellant. With her on the brief were *Edward T. Waters*, *Phillip A. Escoriaza*, and *Christopher J. Frisina*.

*Stephanie R. Marcus*, Attorney, U.S. Department of Justice, argued the cause for appellees. With her on the brief was *Mark B. Stern*, Attorney, and *Robert P. Charrow*, General Counsel, United States Department of Health and Human Services. *R. Craig Lawrence* and *Johnny H. Walker III*, Assistant U.S. Attorneys, entered appearances.

Before: SRINIVASAN, *Chief Judge*, and GARLAND and WILKINS, *Circuit Judges*.

Opinion for the Court filed by *Chief Judge* SRINIVASAN.

SRINIVASAN, *Chief Judge*:  The Department of Health and Human Services disallowed roughly $30 million in Medicaid reimbursements to the Commonwealth of Virginia for payments Virginia made to two state hospitals.  HHS determined that Virginia had materially altered its payment methodology without notifying HHS or obtaining approval and that the new methodology resulted in payments that overstepped applicable federal limits.  The district court upheld HHS's disallowance of the reimbursements.  We now affirm.

I.

Medicaid is a cooperative federal-state program under which States receive financial assistance for the provision of health care to lower-income, disabled, and elderly persons.  *See* 42 U.S.C. § 1396-1.  At the federal level, the program is administered by the Centers for Medicare & Medicaid Services (CMS), an agency within HHS.

A.

States that elect to participate in Medicaid must establish a State Medicaid plan that adheres to the federal statute and HHS regulations.  CMS must approve a State's plan.  *See* 42 U.S.C. § 1396a(a)–(b).  A State can then seek federal reimbursement, termed "federal financial participation," for a portion of the State's payments to hospitals for Medicaid-covered services, provided that the payments comply with the

State's approved plan. 42 U.S.C. § 1396b(a). Funding is administered on an annual basis.

A State Medicaid plan must contain "all information necessary for CMS to determine whether the plan can be approved." 42 C.F.R. § 430.10. The plan should describe how the State will administer its program, including the groups of individuals to be covered, the services to be provided, and the methodologies to be used in calculating payments to providers. *See* 42 U.S.C. § 1396a(a); 42 C.F.R. § 447.201(b).

Federal regulations require States to amend their plans in the event of any material change "in State law, organization, or policy, or in the State's operation of the Medicaid program." 42 C.F.R. § 430.12(c)(1)(ii). States must promptly submit amendments to CMS to enable timely assessment of whether the plan continues to meet the requirements for approval and to ensure the availability of federal financial participation in accordance with regulations governing the effective dates of State plans and plan amendments. *See* 42 C.F.R. §§ 430.12(c)(2), 430.20.

A State's Medicaid plan must describe the calculation of rates of payment for hospital services, including the provision of services by hospitals that serve a disproportionate number of low-income patients with special needs. 42 U.S.C. § 1396a(a)(13)(A); 42 C.F.R. § 447.201(b). Those hospitals are known as disproportionate share hospitals. Disproportionate share hospitals receive supplemental federal financial participation, called DSH payments, to account for the high volume of Medicaid recipients they serve. *See* 42 U.S.C. § 1396r-4(c). A State's Medicaid plan identifies the State's disproportionate share hospitals and sets out the method used to calculate reimbursements to those hospitals. *See* 42 C.F.R. § 447.299(c).

A State's DSH payment methodology is subject to two federal limitations imposed by the Medicaid statute, each of which limits the amount of the State's DSH payments for which federal financial participation will be available. The first limit is the statewide DSH allotment, which sets an annual (fiscal-year) limit on a State's overall amount of DSH payments. 42 U.S.C. § 1396r-4(f). The second limit is the hospital-specific limit, which imposes a hospital-specific ceiling on the amount of DSH payments to a given disproportionate share hospital in a fiscal year based on the hospital's costs of services. 42 U.S.C. § 1396r-4(g)(1)(A).

B.

This case concerns DSH payments made by Virginia's Department of Medical Assistance Services to two State-owned hospitals, the University of Virginia Health System and the Virginia Commonwealth University – Medical College of Virginia Health System. In 2015, CMS disallowed roughly $41 million in federal financial participation for DSH payments made by Virginia to those hospitals in fiscal years 2010 and 2011. Virginia later repaid HHS federal financial participation of some $10 million, such that the amount ultimately at issue in this case is just over $30 million.

CMS denied Virginia's claimed reimbursements because Virginia had allocated DSH payments for the two hospitals to fiscal years other than "the actual year in which [related] DSH costs were incurred" by those hospitals. CMS Notice of Disallowance Letter (Aug. 20, 2015), J.A. 46. For example, in 2010, Virginia made a DSH payment to one of the hospitals related to costs the hospital had incurred in fiscal year 2004, but Virginia allocated the payment to fiscal year 2006 for purposes of complying with the annual statewide DSH

allotment and hospital-specific limit. If Virginia had allocated that DSH payment to the fiscal year in which the hospital's associated costs had been incurred, the payment would have been in excess of the statewide DSH allotment for that year (and thus would have been ineligible for federal financial participation). *See* 42 C.F.R. § 447.297(d)(2).

HHS's Departmental Appeals Board upheld CMS's disallowance. *Va. Dep't of Med. Assistance Servs.*, DAB No. 2727, 2016 WL 5345702, at *1 (Aug. 8, 2016). The Board rested its decision on two independent rationales. First, the Board determined that Virginia's methodology for allocating the DSH payments at issue was unsupported by the language of the State plan and materially inconsistent with Virginia's previous representations about its methodology for calculating DSH payments. *Id.* at *1, *6–10. In particular, in a 2002 appeal to the Board concerning Virginia's DSH payment practices, Virginia had represented that it allocated DSH payments to hospitals in a manner corresponding to the year in which the associated costs had been incurred, whereas Virginia's now-challenged practice allocated DSH payments without regard to the year in which the associated costs are incurred. *See Va. Dep't of Med. Assistance Servs.*, DAB No. 1838, 2002 WL 2031569, at *4 (Aug. 2, 2002). Second, and in the alternative, the Board held that CMS's disallowance was consistent with the applicable federal statutes and regulations, which contemplate the allocation of DSH payments to the fiscal year in which the associated costs are incurred rather than to some other year.

Virginia sought judicial review of the Board's decision in the district court. *Va. Dep't of Med. Assistance Servs. v. U.S. Dep't of Health and Human Services*, 2018 WL 4705792 (D.D.C. Sept. 30, 2018). The district court upheld the Board's

decision and granted summary judgment in favor of HHS. *Id.* at *1. Virginia now appeals.

## II.

The Board's decision disallowing federal financial participation for Virginia's DSH payments relied on two independent rationales. The first is that Virginia's payment methodology is unsupported by the State plan's language and materially inconsistent with the State's prior representations. Because we see no basis for rejecting that ground for the Board's decision, we have no occasion to examine the second ground (viz., that the disallowance is consistent with federal statutes and regulations).

The key question is whether Virginia's prior representations about its DSH payment methodology are consistent with its presently-challenged practice of allocating its DSH payments to a fiscal year other than the year in which the recipient hospital incurred the associated costs. Under that practice, the State can seek federal financial participation for its DSH payments to a hospital even if the hospital's related costs were incurred in a year for which the statewide allotment limit (or hospital-specific limit) has been exhausted—the State can simply allocate the payments to a different fiscal year for which those limits remain unexhausted.

That practice, the Board determined, is materially inconsistent with Virginia's prior representations to the Board about the meaning and operation of its State plan. The Board explained that, in a 2002 appeal to the Board that concerned Virginia's DSH payments, Virginia represented that its DSH payments from a given fiscal year matched a hospital's "uncompensated costs of services" during that specific year. *Va. Dep't of Med. Assistance Servs.*, DAB No. 2727, 2016 WL

5345702, at *9); *see also* DAB No. 1838, 2002 WL 2031569, at *4 (Aug. 2, 2002). Indeed, Virginia had argued that its process in that regard "was not only permissible, but required under its state plan." DAB No. 2727, 2016 WL 5345702, at *9.

In Virginia's payment practice at issue in this case, however, Virginia allocated its DSH payments to a hospital without regard to the fiscal year in which the hospital incurred the associated costs. As a result, the Board held, Virginia had "materially changed its DSH payment practice without notifying CMS, submitting a state plan amendment to reflect the change, or obtaining CMS approval before implementing the revised practices, contravening section 430.12(c) of the Medicaid regulations." *Id.* at *10. (Recall that a State must amend its State plan if there is any material change in its "operation of the Medicaid program." 42 C.F.R. § 430.12(c)(1)(ii).)

HHS contends that substantial evidence supports the Board's holding that Virginia's challenged DSH payment methodology is materially inconsistent with the State's prior practice and interpretation of its plan. Virginia, for its part, does not dispute the applicability of the substantial-evidence standard. *See Friedman v. Sebelius*, 686 F.3d 813, 818 (D.C. Cir. 2012) (HHS's Departmental Appeals Board findings supported by substantial evidence "shall be conclusive."). We agree with HHS: substantial evidence supports the Board's holding that Virginia's challenged plan's methodology is materially inconsistent with the State's representations about its plan's operation in the 2002 dispute.

In that dispute, the official responsible for administering Virginia's Medicaid program stated in a declaration that Virginia's DSH payments are made "only after the hospitals

have performed the services that entitle them to reimbursement and the hospitals have submitted their annual cost reports." Declaration of N. Stanley Fields ¶ 10, J.A. 140–41. Virginia then "matched [DSH payments] to the State DSH Allotment applicable to the year in which the services were performed," *id.* at ¶ 17, J.A. 142, by making DSH payments a function of a hospital's unreimbursed costs of serving Medicaid and uninsured individuals during that year. *See id*. at ¶ 10(a), J.A. 140. Virginia echoed that account of its practice in its briefs, stating that DSH payments "based on the [hospitals'] annual cost reports . . . are matched to the State DSH Allotment *applicable to the year in which the services were performed*." Supplemental Br. for Appellant in *Va. Dep't of Med. Assistance Servs.*, DAB No. 1838, 2002 WL 2031569 at 2, J.A. 162 (emphasis added). And the Board's 2002 decision accepted Virginia's undisputed representations about its method of calculating DSH payments. *See Va. Dep't of Med. Assistance Servs.*, DAB No. 1838, 2002 WL 2031569, at *4. But those representations are inconsistent with Virginia's later operation of the DSH payment program, in which Virginia allocated DSH payments without regard to the year in which the hospitals incurred the relevant costs. *See Va. Dep't of Med. Assistance Servs.*, DAB No. 2727, 2016 WL 5345702, at *9–10.

Virginia asserts that any variation between its representations in the 2002 dispute and its practices at issue in this case are explained by "important changes in the regulatory landscape during the intervening time." Virginia Reply Br. 12. The regulatory changes described by Virginia, however, involve the audit process States use to monitor the hospital-specific limit. *See id.* Virginia does not explain how those changes bear on whether the State allocates its DSH payments to the year in which the hospital incurs the associated costs or instead is free to allocate the payments to any year in which the statewide and hospital-specific limits are unexhausted. On that

issue, Virginia's representations in the 2002 dispute cannot be squared with Virginia's challenged practices in this case.

Virginia separately relies on the Second Circuit's decision in *Concourse Rehab. & Nursing Ctr., Inc. v. DeBuono*, 179 F.3d 38 (2d Cir. 1999). According to Virginia, *Concourse* shows that any difference between the State's 2002 representations and its challenged practices here do not represent a "change" within the meaning of the regulation calling for amendment of a State plan and presentation to CMS for approval when there is a material change to the operation of the State's Medicaid program. 42 C.F.R. § 430.12(c)(1)(ii). Virginia's reliance on *Concourse* is misplaced.

In that case, a nursing home challenged a State audit that had determined that the home had received Medicaid reimbursements to which it was unentitled. 179 F.3d at 40. The nursing home sued the State, contending that the State had changed its Medicaid plan without federal approval, in contravention of the federal regulation. In particular, the nursing home argued that the State's interpretation of its Medicaid plan deviated so much from the plan's terms as to amount to a de facto amendment of the plan that required federal approval. *Id.* at 44. The court rejected that argument, holding that a State's interpretation of its plan could amount to a "change" of the plan within the meaning of the regulation only if "the clear and unequivocal effect of the interpretation is actually to alter the written terms of the plan." *Id.* at 46.

*Concourse* has little to do with in this case. *Concourse* did not review federal agency action and so did not involve an application of the substantial-evidence standard, which Virginia does not dispute is applicable here. And *Concourse*, at any rate, addressed whether a State's interpretation of its plan departs so far from the plan's terms to amount to a de facto

change to the plan's provisions. This case, by contrast, does not turn on a comparison between the State's interpretation of the plan and the language of the plan. Instead, this case involves a comparison between the State's previous operation of its plan—as manifested in the State's prior representations about the plan's operation—and its later operation of the same plan. And in that regard, under the plain terms of the applicable regulation, whenever there is a "[m]aterial change" in "the State's operation of the Medicaid program," the State must amend its plan and present the amendment to CMS for approval. 42 C.F.R. § 430.12(c)(1)(ii).

The Board did not err in finding the existence of such a material change in this case. Consequently, we sustain the Board's disallowance of federal financial participation for the Virginia DSH payments at issue.

\* \* \* \* \*

For the foregoing reasons, we affirm the judgment of the district court.

*Affirmed.*