# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued February 9, 2024          Decided April 4, 2025

No. 23-5055

ASANTE, ET AL.,
APPELLANTS

v.

ROBERT F. KENNEDY, JR., IN HIS OFFICIAL CAPACITY,
SECRETARY, DEPARTMENT OF HEALTH AND HUMAN SERVICES,
ET AL.,
APPELLEES

Appeal from the United States District Court
for the District of Columbia
(No. 1:20-cv-00601)

*Dean L. Johnson* argued the cause for appellants. With him on the briefs was *Thomas J. Weiss*.

*McKaye L. Neumeister*, Attorney, U.S. Department of Justice, argued the cause for appellees. With her on the brief were *Brian M. Boynton*, Principal Deputy Assistant Attorney General, and *Alisa B. Klein*, Attorney.

Before: SRINIVASAN, *Chief Judge*, KATSAS and CHILDS, *Circuit Judges*.

2

Opinion of the Court filed by *Chief Judge* SRINIVASAN.

Dissenting opinion filed by *Circuit Judge* KATSAS.

SRINIVASAN, *Chief Judge*:  California collects a fee from in-state hospitals and then uses a portion of the revenues, along with matching federal Medicaid funds, to provide subsidies to California hospitals that serve the State's Medicaid beneficiaries.  A group of out-of-state hospitals located near the California border filed this suit seeking access to the subsidy payments.  While those out-of-state hospitals sometimes serve California Medicaid beneficiaries who come across the border, they do not pay the fee assessed against in-state hospitals to generate revenues for the subsidy program.

The out-of-state hospitals argue that their exclusion from the subsidy payments discriminates against out-of-state entities in violation of the dormant Commerce Clause and the Equal Protection Clause.  They also contend that federal Medicaid regulations require paying them the subsidy.  The district court rejected those arguments.  We affirm.

I.

A.

Medicaid is a cooperative federal-state program that funds medical care for low-income persons.  *See* 42 U.S.C. § 1396 *et seq*.  State participation in Medicaid is voluntary, but a State that opts to participate must comply with conditions imposed by federal law if it wishes to maintain access to federal Medicaid funding.  *NB ex rel. Peacock v. District of Columbia*, 794 F.3d 31, 35 (D.C. Cir. 2015); *Gallardo ex rel. Vassallo v. Marstiller*, 596 U.S. 420, 424 (2022).

To participate in Medicaid, a State must establish a State Medicaid plan that adheres to the Medicaid Act and Department of Health and Human Services (HHS) regulations. *Dep't of Med. Assistance Servs. v. U.S. Dep't of Health & Hum. Servs.*, 967 F.3d 853, 854–55 (D.C. Cir. 2020). The Centers for Medicare and Medicaid Services (CMS), an agency within HHS, administers the Medicaid program and approves a State's Medicaid plan. *Id.*; 42 C.F.R. § 430.12(c); *see* 42 U.S.C. § 1396a(a)–(b). When a State amends its Medicaid plan, it must obtain CMS's approval that the plan still complies with federal law. 42 C.F.R. § 430.12(c).

Federal Medicaid funding is available to States for expenditures related to the provision of a covered Medicaid service to a Medicaid beneficiary. 42 U.S.C. § 1396b; *see* 42 C.F.R. §§ 435.1002, 435.1007, 435.1009. There are two types of State Medicaid expenditures that bear on this case: (i) base payments, which CMS has defined as payments made to providers "on a per-claim basis for services rendered to a Medicaid beneficiary," and (ii) supplemental payments, which are payments to providers separate from (and in addition to) the "per-claim" base payments for services rendered to a beneficiary. *See* Medicare and Medicaid Programs; Minimum Staffing Standards for Long-Term Care Facilities and Medicaid Institutional Payment Transparency Reporting, 89 Fed. Reg. 40,876, 40,925 (June 21, 2024) (citing 42 U.S.C. § 1396b(bb)); 42 C.F.R. § 438.6(a).

States are not required to fund their share of Medicaid expenditures entirely on their own. Instead, a State may tax providers to generate funds that the federal government will then match. For a tax on providers to be permissible under Medicaid, it must meet certain federal conditions. *See Dana-Farber Cancer Inst. v. Hargan*, 878 F.3d 336, 339 (D.C. Cir. 2017).

4

B.

California participates in Medicaid through its Medi-Cal program. Cal. Welf. & Inst. Code § 14000 *et seq.* In 2009, California established the Quality Assurance Fee (QAF) as part of its administration of Medi-Cal. The QAF program operates by: (i) assessing a provider tax, which California calls a quality assurance fee, on nonexempt in-state hospitals; (ii) using those funds to generate matching federal Medicaid funding; and (iii) distributing the collected funds as supplemental payments to qualifying private in-state hospitals. *Id.* §§ 14169.50, 14169.52, 14169.54, 14169.55.

Private acute care hospitals in California generally are required to pay the provider tax and are eligible to receive the QAF supplemental payments. *Id*. §§ 14169.52(a), 14169.54, 14169.55. Certain private hospitals, such as small and rural hospitals, are exempted from having to pay the provider tax but can still receive the QAF supplemental payments. *Id*. §§ 14169.51(l), 14169.52(a), 14169.54, 14169.55.

California does not require any out-of-state hospitals to pay the QAF provider tax. But out-of-state hospitals also do not receive QAF supplemental payments. California law permits the State, "[t]o the extent permitted by federal law and other federal requirements," to allow out-of-state hospitals to opt into the QAF program. *Id*. § 14169.83. The current Medi-Cal plan, as approved by CMS, however, does not include that option, and so out-of-state hospitals presently cannot opt into the QAF program.

California assesses the QAF provider tax and disburses QAF supplemental payments under a formula that directs more money to hospitals that serve a higher number of Medi-Cal

beneficiaries. California calculates each hospital's provider tax based on the facility's total days of patient care. The QAF supplemental payments to a hospital, meanwhile, are based on total *Medi-Cal* days, i.e., days serving Medi-Cal beneficiaries. That means a nonexempt hospital serving a sizable number of patients, but a relatively small number of Medi-Cal beneficiaries, can lose money in the QAF program by paying a large tax but receiving little in the way of QAF supplemental payments. The reverse is also true: a hospital serving a high proportion of Medi-Cal beneficiaries relative to its total patient population is likely to realize a net gain.

The QAF supplemental payments, as their name indicates, are supplemental payments. Unlike base payments, the QAF supplemental payments do not reimburse providers for the costs of providing specific services to specific beneficiaries. Instead, the QAF supplemental payments are in the nature of a periodic bonus for generally providing care to Medicaid beneficiaries, and they are designed to be distinct from base payments. *Id.* §§ 14169.54(a), 14169.55(a). Every two years, California submits for CMS approval its plan specifying how it will distribute QAF supplemental payments.

## C.

Following the creation of the QAF program, a group of out-of-state hospitals located near the California border challenged the program in federal court in California. The hospitals claimed an entitlement to receive the QAF supplemental payments, which, as explained, go solely to in-state hospitals. California entered into settlement agreements under which it gave QAF supplemental payments to those out-of-state hospitals. The settlement agreements expired in 2019.

In 2020, CMS approved the QAF program for the next two-year cycle. A group of out-of-state hospitals located near the California border sought judicial review of CMS's approval in the district court for the District of Columbia. The out-of-state hospitals argued that their exclusion from the QAF supplemental payments violates the Commerce Clause, the Equal Protection Clause, and federal Medicaid regulations. The district court granted summary judgment in favor of CMS. *Asante v. Azar*, 656 F. Supp. 3d 185, 190 (D.D.C. 2023). The hospitals now appeal.

## II.

The plaintiff out-of-state hospitals renew their arguments that their exclusion from the QAF supplemental payments violates the Commerce Clause, the Equal Protection Clause, and federal Medicaid regulations. We review the district court's decision de novo, *Dana-Farber*, 878 F.3d at 340, and we agree with the district court's rejection of the hospitals' claims.

## A.

We first consider the out-of-state hospitals' challenge under the Commerce Clause. The Commerce Clause provides that "Congress shall have Power . . . [t]o regulate Commerce . . . among the several States." U.S. Const. art. I, § 8, cl. 3. Although the Clause grants Congress affirmative power to regulate interstate commerce, the Clause also contains a "negative" aspect known as the dormant Commerce Clause. *Or. Waste Sys., Inc. v. Dep't of Env't Quality of State of Or.*, 511 U.S. 93, 98 (1994). The dormant Commerce Clause "denies the States the power unjustifiably to discriminate

against or burden the interstate flow of articles of commerce." *Id.*

The Supreme Court has laid out two "primary principles" limiting a State's authority under the dormant Commerce Clause: (1) "state regulations may not discriminate against interstate commerce," and (2) "States may not impose undue burdens on interstate commerce." *South Dakota v. Wayfair, Inc.*, 585 U.S. 162, 173 (2018). The challenge in this case involves only the former limit—the bar on discriminating against interstate commerce. As used in the dormant Commerce Clause context, "'discrimination' simply means differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter." *United Haulers Ass'n v. Oneida-Herkimer Solid Waste Mgmt. Auth.*, 550 U.S. 330, 338 (2007) (quoting *Or. Waste*, 511 U.S. at 99). State laws that facially discriminate against interstate commerce are virtually *per se* invalid. *Wayfair*, 585 U.S. at 173 (citing *Granholm v. Heald*, 544 U.S. 460, 476 (2005)).

The plaintiff out-of-state hospitals argue that the QAF program discriminates against interstate commerce because California pays QAF supplemental payments only to in-state hospitals. That argument fails. Both the QAF provider tax assessed against in-state hospitals and the QAF supplemental payments given to in-state hospitals are calculated based solely on the in-state provision of medical care to in-state patients. A tax and supplemental payment based on the *in-state* provision of medical care do not unconstitutionally discriminate against *interstate* commerce. The QAF program does not assess a tax against out-of-state hospitals. There is thus no "obvious effort to saddle those outside the State" with the costs of the QAF program, *see Chem. Waste Mgmt., Inc. v. Hunt*, 504 U.S. 334, 346 (1992) (quoting *City of Philadelphia v. New Jersey*, 437 U.S. 617, 629 (1978)); the hospitals incur no costs associated

with the QAF program because they are not subject to the QAF provider tax.

It is true that the out-of-state hospitals incur costs to treat Medi-Cal beneficiaries who come across the border to receive medical care. But those costs come from the treatment itself, not from the QAF program. And Medi-Cal reimburses providers' costs of treating Medi-Cal beneficiaries (including costs incurred by out-of-state hospitals) through the base payments to providers. As for the QAF program, out-of-state hospitals neither incur the costs (the provider tax) nor receive the benefits (the supplemental payments). That program does not discriminate against interstate commerce—there is simply no "differential burden on any part of the stream of commerce" here. *See W. Lynn Creamery, Inc. v. Healy*, 512 U.S. 186, 202 (1994).

B.

The plaintiff out-of-state hospitals' argument under the Equal Protection Clause likewise lacks merit. The Equal Protection Clause mandates that no State shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. Because the challenged program here "neither proceeds along suspect lines nor infringes fundamental constitutional rights," we apply rational basis review, as the plaintiffs concede. *See FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 313 (1993). And under rational basis review, "legislation is presumed to be valid and will be sustained if the classification drawn by the statute is rationally related to a legitimate state interest." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 440 (1985). A challenged state law must be upheld under that standard "if there is any reasonably conceivable state of facts that could provide a rational basis" for it. *Beach Commc'ns*, 508 U.S. at 313.

The plaintiff hospitals argue that the QAF program discriminates against out-of-state hospitals without a rational basis. We are unpersuaded. The plaintiff hospitals do not satisfy their burden to show that limiting QAF supplemental payments to in-state hospitals is irrational.

California could rationally decide to extend QAF supplemental payments only to in-state hospitals as a means of targeting the subsidy to those providers who serve a disproportionate share of Medi-Cal beneficiaries. Equal protection "does not require that a State must choose between attacking every aspect of a problem or not attacking the problem at all." *Dandridge v. Williams*, 397 U.S. 471, 486–87 (1970). California addressed the problem of ensuring access to Medicaid by focusing chiefly on one aspect: directing the supplemental payments to those private hospitals that provide the lion's share of services furnished to Medi-Cal beneficiaries. It was not irrational for the State to structure the QAF program on the assumption that the bulk of services to Medi-Cal beneficiaries would be supplied by California hospitals, and correspondingly to give the extra payments to—and collect funding for those payments from—in-state providers alone. Medi-Cal beneficiaries are California residents, and it stands to reason that California facilities would largely provide their medical care.

The plaintiff out-of-state hospitals contend that the State's rationale is underinclusive because they, too, are private hospitals who provide care to Medi-Cal patients. And they assert that the State's rationale is also overinclusive because the QAF program gives payments to California private hospitals that serve relatively few Medi-Cal beneficiaries. A law, however, generally "does not fail rational-basis review for being over- or under-inclusive." *Fraternal Ord. of Police,*

*Metro. Police Dep't Lab. Comm., D.C. Police Union v. District of Columbia*, 45 F.4th 954, 958 (D.C. Cir. 2022) (citation omitted), *cert. denied*, 143 S. Ct. 577 (2023).  Rather, "where rationality is the test, a State 'does not violate the Equal Protection Clause merely because the classifications made by its laws are imperfect.'" *Mass. Bd. of Ret. v. Murgia*, 427 U.S. 307, 316 (1976) (quoting *Dandridge*, 397 U.S. at 485).  So the question is not whether California could have made the fit more perfect, but whether it was rational for California to draw the distinction it did.  *See W. & S. Life Ins. Co. v. State Bd. of Equalization of Ca.*, 451 U.S. 648, 670–72 (1981).  We believe it was.

The hospitals also submit that the proffered state interest in targeting private hospitals serving a disproportionate share of Medi-Cal patients should be given minimal weight because it was not set forth in the statute's purpose section.  It instead was advanced only in post-enactment communications between CMS and California agencies.  When we assess a law under rational basis review, however, "the legislature's actual motive is 'entirely irrelevant'; all that matters is whether there are 'plausible reasons' to conclude that the statutory classification furthers a legitimate government interest." *Fraternal Ord.*, 45 F.4th at 958–59 (quoting *Beach Commc'ns*, 508 U.S. at 313–15).  California could rationally conclude that private in-state hospitals serving a disproportionate share of Medi-Cal beneficiaries should be given supplemental monetary support, and the State could rationally decide to advance that goal via the QAF program as it is structured.

C.

The plaintiff hospitals' last argument is that California's QAF program violates an HHS regulation, 42 C.F.R. § 431.52.  Section 431.52 reads as follows:

(a) Statutory basis. Section 1902(a)(16) of the Act authorizes the Secretary to prescribe State plan requirements for furnishing Medicaid to State residents who are absent from the State.

(b) Payment for services. A State plan must provide that the State will pay for services furnished in another State to the same extent that it would pay for services furnished within its boundaries if the services are furnished to a beneficiary who is a resident of the State, and any of the following conditions is met:

(1) Medical services are needed because of a medical emergency;

(2) Medical services are needed and the beneficiary's health would be endangered if he were required to travel to his State of residence;

(3) The State determines, on the basis of medical advice, that the needed medical services, or necessary supplementary resources, are more readily available in the other State;

(4) It is general practice for beneficiaries in a particular locality to use medical resources in another State.

(c) Cooperation among States. The plan must provide that the State will establish procedures to facilitate the furnishing of medical services to individuals who are present in the State and are eligible for Medicaid under another State's plan.

The plaintiff hospitals focus on subsection (b).  They read that subsection to impose a payment-parity requirement, under which, they submit, a State must give the same amount of Medicaid payments to a provider for services to the State's residents in any of the specified categories regardless of whether the provider is located within or outside the State.  And that payment-parity requirement, in the plaintiff hospitals' view, applies to California's QAF supplemental payments.

We disagree.  We conclude that the regulation does not pertain to payments to providers like California's QAF supplemental payments.  We instead read the regulation as addressed to a different type of payment under Medicaid:  base payments given in the State's capacity as a Medicaid beneficiary's health-care insurer—i.e., insurance payments for a specific service rendered to a specific beneficiary.

That reading best comports with the terms of the regulation.  The plaintiff hospitals rely on subsection (b)'s requirement that a State must "pay for services furnished in another State to the same extent" as if the services were rendered "within its boundaries."  42 C.F.R. § 431.52(b).  That language in subsection (b) must be read against the backdrop of subsection (a), which provides the statutory basis for the regulation and sets out its scope.

To that end, subsection (a) explains that the regulation pertains to "State plan requirements for furnishing Medicaid to State residents who are absent from the State."  42 C.F.R. § 431.52(a).  There are various types of State expenditures under the Medicaid program.  Of central relevance for purposes of that regulation, Medicaid in part involves the State acting as insurer for beneficiaries.  *See id.* § 435.900–.965 (describing State requirements for administering Medicaid to applicants

and beneficiaries); Medicaid Program; Ensuring Access to Medicaid Services, 89 Fed. Reg. 40,542, 40,542–43 (May 10, 2024). But Medicaid also encompasses other actions a State takes with respect to covered services provided to Medicaid beneficiaries—actions for which the State can also receive federal Medicaid funding even if not acting as a beneficiary's insurer. For example, States must provide supplemental payments to hospitals that serve a disproportionate share of low-income patients with special needs, *see* 42 U.S.C. § 1396r-4(c), or a State might set up a pool for supplemental payments for in-state trauma care centers, *see* Medicaid Program; Ensuring Access to Medicaid Services, 89 Fed. Reg. at 40,774–75. When a State does so, it is not furnishing insurance to a beneficiary, but instead is providing extra funding to providers to effectuate broader policy ends related to the provision of medical services to needy persons.

Subsection (a) speaks in terms of "furnishing Medicaid to State residents who are absent from the State." 42 C.F.R. § 431.52(a). So the regulation does not encompass *all* expenditures by the State in the Medicaid context, but specifically applies when the State is "furnishing Medicaid *to State residents.*" *Id.* (emphasis added). That language conveys that the regulation applies when the State provides Medicaid insurance to a beneficiary. When the State acts as an insurer under Medicaid, the beneficiary receives care from a provider, and rather than the beneficiary paying for the service, the State pays for it through Medicaid base payments to the provider. Medicaid Program; Medicaid Managed Care: New Provisions, 67 Fed. Reg. 40,989, 40,989 (June 14, 2002). The State thereby effectively reimburses the beneficiary for the costs of her medical care, although rather than give the beneficiary an insurance payment that would enable the beneficiary in turn to pay the provider for the service, the State just pays the provider directly via base payments. *See Wis. Dep't of Health & Fam.*

14

*Servs. v. Blumer*, 534 U.S. 473, 479 (2002) ("The federal Medicaid program provides funding to States that reimburse needy persons for the cost of medical care."). Accordingly, when the State effectively reimburses a beneficiary for the costs of services she receives outside the State, the State is "furnishing Medicaid to State residents who are absent from the State": the State-as-insurer is paying the costs of that beneficiary's out-of-state medical care. 42 C.F.R. § 431.52(a).

The QAF supplemental payments, by contrast, do not fit comfortably within that language. Unlike with base payments, when the State gives QAF supplemental payments to a provider, it is not "furnishing Medicaid *to State residents*." *Id.* (emphasis added). Unlike with base payments, that is, the QAF supplemental payments do not amount to insurance payments to Medi-Cal beneficiaries for the costs of medical services they receive. As the plaintiff hospitals themselves have characterized QAF payments, "QAF monies are NOT payments for services rendered." J.A. 508. Instead, through QAF supplemental payments, the State gives a set of providers extra (i.e., supplemental) money to generally increase funds flowing to them in recognition of their serving Medi-Cal beneficiaries. Unlike when the State acts as insurer for a Medicaid beneficiary who receives medical care outside the State's borders, then, QAF payments do not constitute "furnishing Medicaid to State residents who are absent from the State." 42 C.F.R. § 431.52(a).

That understanding of the overall scope of the regulation, per the introductory subsection (a), informs the proper understanding of subsection (b), the provision centrally relied on by the plaintiff hospitals. The latter subsection, entitled "Payment for services," requires a "State plan [to] provide that the State will pay for services furnished in another State to the same extent that it would pay for services furnished within its

boundaries if the services are furnished to a beneficiary who is a resident of the State," and one of a series of conditions is met. 42 C.F.R. § 431.52(b). The "pay[ments] for services furnished . . . to a beneficiary" addressed by subsection (b), *id.*, when considered against the backdrop of subsection (a), are base payments for specific services given to a specific beneficiary, not supplemental subsidies extended to providers. As just noted, the plaintiff hospitals themselves have stressed that "QAF monies are NOT payments for services rendered." J.A. 508. And if QAF funds are "not payments for services rendered," it stands to reason that they also may not be covered by a provision entitled "Payment for services," whose operative text is addressed to "pay[ments] for services furnished." *See also* Plaintiffs' Compl. ¶ 63, J.A. 31 ("QAF supplemental payment" is "separate from and in addition to Medicaid payments for services rendered").

The history of the regulation supports that understanding of its scope. Originally, the regulation stated that "[m]edical assistance will be furnished to eligible individuals who are residents of the State but are absent therefrom to the same extent . . . ." 45 C.F.R. § 248.40(a)(1) (1970). In 1978, HHS updated the language to say that the "State will furnish medicaid . . . while that recipient is in another State, to the same extent that medicaid is furnished to residents in the State." 42 C.F.R. § 431.52(b) (1978). Finally, in 1991, the current language took effect. Neither of the amendments purported to make any substantive changes to the regulation. *See* Medicare and Medicaid Programs; OBRA '87 Conforming Amendments, 56 Fed. Reg. 8,832, 8,832 (1991); Medicaid Regulations; Reorganization and Rewriting, 43 Fed. Reg. 45,176, 45,176 (1978). Rather, in all its iterations, the regulation has been concerned with furnishing Medicaid to a beneficiary when outside their home State. Put differently, the regulation has consistently addressed base payments made in

the State's capacity as an insurer of individual beneficiaries rather than supplemental payments made in the State's capacity as a policymaker giving bulk disbursements to hospitals.

In sum, because the regulation speaks to contexts in which the State acts as an insurer for Medicaid beneficiaries covered by the State plan, and because QAF supplemental payments do not amount to insurance payments made to Medicaid beneficiaries, we reject the plaintiff hospitals' argument that California's QAF program implicates—much less violates—the regulation.

Our dissenting colleague reads the regulation differently. In his view, the regulation applies not only to base payments to beneficiaries but also to supplemental subsidies to providers like the QAF payments. But even if the payment of QAF subsidies to hospitals relates in some way to the provision of services, *see* Dissenting Op. 5, that does not mean that those supplemental subsidies amount to insurance payments to Medicaid beneficiaries, which we understand to be the focus of the regulation. Under our colleague's interpretation, the regulation would compel the State to extend QAF supplemental payments to out-of-state providers on par with in-state providers even though the out-of-state providers (unlike in-state providers) do not pay the QAF provider tax that funds the supplemental payments. There is no reason to construe the regulation to require that kind of windfall for out-of-state providers: the plaintiff out-of-state hospitals do not deny that they already receive supplemental Medicaid subsidies from their own States, but they now seek to be awarded additional funding from another State's (California's) subsidy pool, into which they do not pay. The better reading of the regulation—as a provision addressed to base payments, not supplemental subsidies—avoids that counterintuitive result.

Our colleague's contrary understanding is grounded in part in the statutory term "medical assistance," which he reads as covering QAF payments and other subsidies bearing a relationship to the provision of medical "care and services," per the statutory definition of "medical assistance." Dissenting Op. 6–7 (citing 42 U.S.C. §§ 1396a(a)(16), 1396d(a)). The term "medical assistance," however, does not appear in the regulation at issue. Our colleague seeks to connect the regulation to that statutory term in a two-step argument disagreeing with our understanding of the regulation's scope.

First, our colleague notes that subsection (a) of the regulation—which, as explained, provides that the regulation concerns the "furnishing [of] Medicaid to State residents who are absent from the State"—indicates that the statutory authorization for the regulation is 42 U.S.C. § 1396a(a)(16). And that authorizing statute allows for regulations that require state Medicaid plans to include provisions "with respect to the furnishing of medical assistance to . . . residents of the State [who] are absent therefrom." Our colleague assumes that, if the regulation's reference to "furnishing [of] Medicaid to State residents" is confined to base payments, then the same must be true of the authorizing statute's reference to "furnishing of medical assistance" to State residents. *See* Dissenting Op. 6.

But that cannot be so, our colleague submits, due to the second step of his analysis. Here, he brings into play a second statute, which provides for federal reimbursements to States for Medicaid expenses, 42 U.S.C. § 1396b(a)(1). That reimbursement statute, like the just-described authorizing statute, uses the term "medical assistance"—here, in providing for federal reimbursements to States of a share of the "amount expended . . . as medical assistance under the State plan." That reimbursement statute's reference to "medical assistance" must encompass QAF subsidies, our colleague observes, because it

is undisputed that federal Medicaid funding to States includes QAF subsidies. And if that is so, our colleague reasons, the authorizing statute's reference to "furnishing of medical assistance" to State residents must also include QAF subsidies, and then, so too must the regulation. *See* Dissenting Op. 6–7.

In short, our colleague assumes as a first step that the regulation's scope matches the authorizing statute's scope, and he next assumes as a second step that the authorizing statute's scope matches the reimbursement statute's scope. And because the reimbursement statute undisputedly pertains to QAF subsidies, he reasons, then so too must the authorizing statute, and thus the regulation as well. We are unpersuaded by either of the two steps.

Consider, initially, the assumption at the latter step that because the reimbursement statute encompasses QAF subsidies, then the authorizing statute must as well. The federal agency charged with administering the Medicaid program disagrees with that assumption. The government argues before us that the authorizing statute has "no bearing on subsidies that States pay to providers" like the QAF subsidies. Gov't Br. 28. Yet the government also acknowledges that federal reimbursements to States encompass the QAF program. *Id.* at 4–5. The government might view the scope of the authorizing and reimbursement statutes to differ because, while both statutes reference "medical assistance," the surrounding language is different. The authorizing statute speaks to "the furnishing of medical assistance . . . to individuals." 42 U.S.C. § 1396a(a)(16). The reimbursement statute refers to "the total amount expended . . . as medical assistance under the State plan." 42 U.S.C. § 1396b(a)(1). While we are not asked to definitively resolve the matter here, it could be that the "furnishing of medical assistance to individuals" concerns base payments for specific services furnished to specific

beneficiaries, but the "total amount expended as medical assistance" includes QAF subsidies.  *Cf.* 42 U.S.C. § 1396b(bb)(1)(B)(iv) (referring to "the total Medicaid payments made to an inpatient hospital provider, including the supplemental payment").

Regardless, even assuming the authorizing statute's reference to "furnishing of medical assistance to individuals" encompasses QAF subsidies, that would not necessarily mean—at the first step of our colleague's reasoning—that the regulation at issue also has that reach.  The authorizing statute gives the Department the authority to establish regulations providing for the "inclusion" in State Medicaid plans "of provisions . . . with respect to furnishing of medical assistance under the plan to individuals who are residents of the State but are absent therefrom."  42 U.S.C. § 1396a(a)(16).  Nothing in that statute requires that any regulations adopted by the Department must encompass the entire sweep of the statutory authorization.  Instead, the Department could opt to establish regulations with a narrower reach, pertaining solely to base payments to beneficiaries for services they receive.  We conclude, for all the reasons explained, that the Department did just that in adopting a regulation addressed to "furnishing Medicaid to State residents."  42 C.F.R. § 431.52(a).

Finally, our dissenting colleague suggests that our interpretation of that regulation is in tension with a separate regulation pertaining to upper federal payment limits under Medicaid.  *See* Dissenting Op. 7 (citing 42 C.F.R. § 447.1).  The latter regulation references "payments made by State Medicaid agencies for Medicaid services."  That provision, according to our colleague, encompasses QAF subsidies, and if "payments . . . for Medicaid services" for purposes of that regulation include QAF subsidies, he reasons, then the same should be true of the regulation at issue here.  No party in this

case, however, cites or relies on the upper-payment-limit regulation, so its proper interpretation is not before us. And whatever the scope of that provision may be, there is no reason to assume that it would dictate whether a differently worded regulation addressed to "furnishing Medicaid to State residents," 42 C.F.R. § 431.52(a), pertains to base payments and not supplemental subsidies, as we have concluded it does.

\* \* \* \* \*

For the foregoing reasons, we affirm the judgment of the district court.

*So ordered.*

KATSAS, *Circuit Judge*, dissenting: A federal regulation requires a State, when reimbursing hospitals for services furnished to its Medicaid beneficiaries, to "pay for services furnished in another State to the same extent that it would pay for services furnished within its boundaries." 42 C.F.R. § 431.52(b). California pays in-state and out-of-state hospitals base amounts keyed to specific services furnished to beneficiaries. On top of that, California provides in-state hospitals, but not out-of-state hospitals, with supplemental payments keyed to all Medicaid services furnished by the hospital. My colleagues conclude that these targeted supplemental payments do not violate the regulation. For the reasons that follow, I respectfully disagree.

I

Medicaid is a cooperative federal-state program that funds healthcare for low-income individuals. 42 U.S.C. § 1396 *et seq.* It is administered by the States and jointly funded by federal and state governments. To participate in Medicaid, a State must develop and obtain federal approval for a plan to provide "medical assistance" to the needy. *Id.* § 1396a(a). If a plan receives approval, the federal government must reimburse the State for a percentage of amounts spent in providing "medical assistance" under the plan. *Id.* § 1396b(a)(1). The term "medical assistance" means "part or all of the cost" of providing covered "care and services" to beneficiaries, as well as "the care and services themselves." *Id.* § 1369d(a). States may fund their share of these expenses through certain taxes on healthcare providers. *Id.* § 1396b(w).

A state plan must set forth "rates of payment" for covered services. 42 U.S.C. § 1396a(a)(13)(A). Such rates may include "base" payments keyed to specific services provided, as well as certain "supplemental" payments determined more generally. *Id.* § 1396b(bb); *see also* Medicaid & CHIP Payment & Access Comm'n, Medicaid Base and Supplemental

Payments to Hospitals (April 2024), https://perma.cc/WR86-GLMM. But there are "upper payment limits" for hospitals, with base and supplemental payments jointly counting against the same limits. 42 U.S.C. § 1396b(bb)(1)(B)(iv).

This case involves payment for services provided to beneficiaries out-of-state. The Medicaid statute requires a state plan to include, "to the extent required by regulations," provisions for "the furnishing of medical assistance under the plan to individuals who are residents of the State but are absent therefrom." 42 U.S.C. § 1396a(a)(16). When certain exigencies are present, the implementing regulation requires the State to "pay for services furnished in another State to the same extent that it would pay for services furnished within its boundaries if the services are furnished to a beneficiary who is a resident of the State." 42 C.F.R. § 431.52(b).

California participates in Medicaid through its Medi-Cal program. Cal. Welf. & Inst. Code § 14000 *et seq.* California funds its share of Medicaid expenses in part through a tax on hospitals called a "quality assurance fee" (QAF). *Id.* § 14169.52(a). It pays the tax proceeds to in-state hospitals as "supplemental amounts"—which are keyed to Medi-Cal patient volume—for treating Medi-Cal beneficiaries. *Id.* §§ 14169.54(a), 14169.55(a). California makes these payments to "improv[e] hospital reimbursement through supplemental Medi-Cal payments." *Id.* § 14169.50(b). The payments are in addition to base payments and are set to "result in payments to hospitals that equal" the Medicaid upper payment limits. *Id.* §§ 14169.54(a), 14169.55(a); *see id.* § 14169.59; J.A. 543–47. By increasing its own Medi-Cal spending, California also seeks "to increase federal financial participation" in providing the covered care. Cal. Welf. & Inst. Code § 14169.50(d).

3

The Centers for Medicare & Medicaid Services approved a plan amendment allowing California to pay these QAF subsidies. A group of out-of-state hospitals near the California border sought judicial review. They urged that the subsidies, targeted exclusively to in-state hospitals, violate the Commerce Clause, the Equal Protection Clause, and the regulation on payment for out-of-state care. The district court rejected these arguments and granted summary judgment to CMS. *Asante v. Azar*, 656 F. Supp. 3d 185 (D.D.C. 2023).

II

In my view, the QAF payments violate the out-of-state payment regulation because they flow only to in-state hospitals. In pertinent part, the regulation requires California to "pay for services furnished in another State to the same extent that it would pay for services furnished within its boundaries if the services are furnished to a beneficiary who is a resident of the state." 42 C.F.R. § 431.52(b). In other words, if California would pay for "services furnished" to a Medi-Cal beneficiary by an in-state hospital, it likewise must pay, "to the same extent," if an out-of-state hospital provides the services. California respects that requirement insofar as it makes the same base payments regardless of whether Medi-Cal beneficiaries receive treatment in-state or out-of-state. But the QAF payments then give *in*-state hospitals *additional* compensation for treating Medi-Cal beneficiaries. These payments are aimed at "improving hospital reimbursement through supplemental Medi-Cal payments to hospitals." Cal. Welf. & Inst. Code § 14169.50(b); *see also id.* § 14169.50(a) (QAF payments aim "to improve funding for hospitals and obtain all available federal funds to make supplemental Medi-Cal payments to hospitals"). They are "in addition to" the base payments that all hospitals receive for treating Medi-Cal beneficiaries. *Id.* §§ 14169.54(a), 14169.55(a). And the state

plan confirms that California makes the payments "for the provision of hospital inpatient services" to Medi-Cal beneficiaries. J.A. 543. In other words, QAF payments are extra payments to in-state hospitals for services furnished through Medicaid.

The government objects that the regulation addresses coverage but not payment amounts. In other words, it reads the requirement to "pay for" in-state and out-of-state services "to the same extent" as meaning that a State must *cover* the same services regardless of where they are provided—not that it must pay the same *amount* (or pay under the same formula) regardless of where the services are provided. For good reason, my colleagues do not adopt this contention. Section 431.52 is titled "Payments for services furnished out of State," and subsection (b) is likewise titled "Payment for services." Those would be odd titles if the regulation were addressed only to what services must be covered. Moreover, the operative text does not simply require a State to "pay" *some* amount for—*i.e.*, to cover—services regardless of where they are provided. Instead, it requires a State to pay "to the same extent" regardless of where the services are provided. That phrase governs the required amount of payment.

My colleagues adopt a different theory to exclude QAF payments from the out-of-state payment regulation. They conclude that 42 C.F.R. § 431.52 covers only base payments keyed to specific individual services provided to Medicaid beneficiaries—not supplemental payments for treating Medicaid beneficiaries more generally. They derive this limit not from subsection (b), which sets forth the legally operative text, but from subsection (a), which is titled "Statutory basis." In its entirety, subsection (a) states that "Section 1902(a)(16) of the [Medicaid] Act," which is codified at 42 U.S.C. § 1396a(a)(16), "authorizes the Secretary [of Health and

5

Human Services] to prescribe State plan requirements for furnishing Medicaid to State residents who are absent from the State." 42 C.F.R. § 431.52(a). My colleagues reason that QAF payments, as general subsidies untethered to specific individual medical procedures, do not involve "furnishing Medicaid *to State residents*." *See ante* at 12–15.

With respect, I do not think subsection (a) is so limiting. To begin with, the phrase "to State residents" simply reflects a truism that one State need not provide Medicaid benefits to another State's residents. In my view, the key phrase in subsection (a) is the immediately preceding one—"furnishing Medicaid." The dispositive question it frames is whether QAF payments are for "furnishing Medicaid" to beneficiaries. The answer is clearly yes: The California legislature repeatedly declared QAF payments to be "supplemental Medi-Cal payments to hospitals." Cal. Welf. & Inst. Code § 14169.50(a), (b), (d) & (e). They are made "for the provision of … hospital services" to Medi-Cal beneficiaries. *Id.* §§ 14169.54(a) (outpatient), 14169.55(a) (inpatient). And while they are not disaggregated into individual services provided, they do reflect how much "Medicaid" each hospital has "furnish[ed]" because they are keyed to the number of Medi-Cal patient days of each hospital. *See id.* §§ 14169.54(b), 14169.55(b), 14169.59; J.A. 542–53. Whether California pays hospitals a base amount for each appendectomy performed for Medi-Cal beneficiaries, or a supplemental amount keyed to the total number of patient-days attributable to appendectomies performed for Medi-Cal beneficiaries, the State is still paying hospitals for "furnishing Medicaid to State residents." Moreover, the regulation implements a statutory directive to provide for "the furnishing of medical assistance" to beneficiaries who receive treatment out-of-state. 42 U.S.C. § 1396a(a)(16). And "medical assistance"—a key phrase at the heart of the Medicaid statute—is defined as "payment of part or all of the cost" of

covered "care and services" provided to beneficiaries, "or the care and services themselves." *Id.* § 1396d(a). So the dispositive statutory question is whether QAF payments are for furnishing medical "care and services," and again the answer is clearly yes.[1]

In addition, my colleagues' position would foreclose federal funding for any portion of the QAF payments, and so proves too much. As explained above, the regulatory requirement "for furnishing Medicaid to State residents" out-of-state parallels the statutory authorization for regulations regarding "the furnishing of medical assistance" to such residents. *See* 42 U.S.C. § 1396a(a)(16); 42 C.F.R. § 431.52(b). And Medicaid authorizes federal funding only for a percentage of amounts that a State expends to provide "medical assistance" under its plan, 42 U.S.C. § 1396b(a)(1), as well as for various administrative expenses, *id.* § 1396b(a)(2) to (7). So if QAF payments did not qualify as "medical assistance" under section 1396a(a)(16), then the federal government could not pay for a share of those subsidies

---

[1] My colleagues do not quarrel with the point that QAF payments involve "the furnishing of medical assistance" under the statute. Instead, they seek to distinguish that phrase from "furnishing Medicaid to State residents" under the implementing regulation. *Ante* at 19. As explained above, the parallel between the two phrases seems to me obvious. My colleagues' primary response is to observe that an implementing regulation may sweep less broadly than its authorizing statute. *See id*. As a general proposition, that is certainly true. But the regulatory provision they invoke here, subsection (a) of 42 C.F.R. § 431.52, is not so limiting. And in any event, the legally operative regulatory provision is subsection (b), which covers QAF payments by its terms.

through Medicaid. And nobody—including my colleagues—defends that conclusion.[2]

Consider also the upper payment limits. Base and supplemental payments count against them. *See* 42 U.S.C. § 1396b(bb)(1)(B)(vi). But only payments "for Medicaid services" count. 42 C.F.R. § 447.1. So under the regulations, payments "for Medicaid services" must include base and supplemental payments. Moreover, California law treats QAF payments as subject to the "applicable federal upper payment limit," and it fixes their amount to ensure that the total payments made to hospitals—with QAF payments included—equal but do not exceed that limit. Cal. Welf. & Inst. Code § 14169.55(a). California thus sought federal approval to include QAF payments in its plan on the assumption that they count against the upper limits. J.A. 561, 592–603. In approving the plan amendment, CMS likewise treated the QAF payments as subject to the "upper payment limit," but concluded that these payments, "when added to the base rate payments and other supplemental payments received by private hospitals in California, are within the upper payment limits." J.A. 535. In sum, both CMS and California took as a given that QAF supplemental payments, like the base payments received by in-state and out-of-state hospitals, are payments for Medicaid services.[3]

---

[2] My colleagues posit that QAF payments might involve "amount[s] expended … as medical assistance" under § 1396b(a)(1), but not "furnishing of medical assistance to individuals" under § 1396a(a)(16). *Ante* at 18–19. Again, the parallel seems obvious.

[3] My colleagues note that the parties do not address the upper payment limits in this court. *Ante* at 19. But the agency order under review rests squarely on the premise that QAF payments are "for

Two final points in response to my colleagues. First, they suggest that out-of-state hospitals would obtain a "windfall" in receiving QAF payments while not paying the QAF tax. *Ante* at 16. But California does not offer hospitals the payments in return for the tax. Nor could it, for federal regulations prohibit a State from linking its Medicaid taxes and its Medicaid payments in that way. *See* 42 C.F.R. § 433.68(b)(3) & (f)(3); J.A. 309–10. Instead, California imposes the tax as one means for raising revenue to pay its share of Medicaid expenses. And it separately pays hospitals in return for treating California residents who are Medi-Cal—and thus Medicaid—beneficiaries. In sum, my approach would simply require California to pay out-of-state hospitals the same amount that it would pay in-state hospitals for services provided to Medi-Cal patients. I do not see that as a windfall.[4]

Second, my colleagues invoke the plaintiff hospitals' statement in the district court that QAF subsidies, in contrast to base payments, "are not payments for services rendered." J.A.

---

Medicaid services" and thus subject to the limits. J.A. 535. Moreover, we should consider all pertinent regulations in seeking to best construe the one directly at issue, as my colleagues elsewhere recognize. *Ante* at 14–15. And I can discern no plausible ground for concluding that QAF payments are "for Medicaid services" under the regulation on upper payment limits, but are not for "furnishing Medicaid to State residents" under 42 C.F.R. § 431.52.

[4] Even if out-of-state hospitals could opt into the QAF tax in return for QAF payments, their failure to do so would not suggest any windfall. The QAF tax is keyed to a hospital's *entire* patient base, while the QAF payments are keyed to the amount of treatment provided to *Medi-Cal* patients only. *See ante* at 4–5. Because out-of-state hospitals treat vastly fewer Medi-Cal patients than do in-state hospitals, the hypothetical bargain suggested by my colleagues would be wildly unfavorable to the out-of-state hospitals.

508 (cleaned up); *see ante* at 15. The hospitals did not make that statement in addressing any of the statutory or regulatory provisions that bear on the scope of 42 C.F.R. § 431.52(b). Instead, they made it to support a different argument that California, in making the QAF payments, acts as a regulator for dormant Commerce Clause purposes. And the government, opposing the plaintiffs' position, urged that "base rates," which all agree involve California acting as a market participant, and "QAF payments" are indistinguishable for Commerce Clause purposes. J.A. 487. Thus, to the extent there is any tension between the parties' respective positions on the regulatory and constitutional issues presented in this case, it is one that appears on both sides of the dispute.

III

California pays in-state hospitals more for furnishing care to Medi-Cal beneficiaries than it would pay similarly situated out-of-state hospitals for furnishing the same care. This payment scheme violates the clear command of 42 C.F.R. § 431.32(b), so I must respectfully dissent from part II.C of the Court's opinion. And because the payment scheme violates the regulation, I would not reach the question whether it also violates the Constitution.